We will hear argument next in No. 18-1397, UCB v. Watson Labs. And because you've decided to stand up three times instead of four times, we will feel free to discuss both the 414 and the 434 in your opening argument. And you might feel free to do the same. Thank you, Judge Toronto. May it please the Court. John O'Quinn on behalf of activists. I intend to focus most of my argument on the doctrine of equivalence, but if I may, I'd like to start very briefly with anticipation of Claim 1 of the 434 patent. The district court found that Cygnus disclosed, quote, reticotine freebase present in the matrix in the absence of water, end quote. And it found that Cygnus teaches the replacing of the water of Example 15 with other solvents. That's at Appendix 156. But then it somehow found that Cygnus did not disclose a patch containing reticotine freebase. It reasoned that applying the conditions of Example 15, the reticotine would be primarily in its salt form. Now, respectfully, that doesn't make sense. First, even while it said that freebase was missing, it acknowledged that 1.28% of the reticotine would be freebase. That's Appendix 158, and it's relying on or citing Appendix 4530. And the fact that the salt rather than the freebase might primarily be present, a point the district court emphasized twice on 158, is legally irrelevant. More importantly, UCV's Dr. Lane admitted that in Cygnus, quote, the freebase is the form of the drug that permeates through the skin. That's at 4560. And the person would have understood that at the time. Is Cygnus in the absence of water? So Cygnus discloses the absence of water. Example 15 of Cygnus uses water, but Cygnus specifically teaches that you can replace the water with ethanol. That's at 5709 of the appendix is where that is in Cygnus. And the district court found that you could make that type of substitution. Cygnus' disclosure, of course, of replacing water with ethanol is also presumed to be enabled. And again, as Dr. Lane testified, what works is the freebase, not the salt. So that should be the end of the matter. That requires reversal as to Claim 1 based on anticipation, and obviousness should follow as to the other claims. Now, unless there are further questions on those issues, let me turn to the doctrine of equivalence.  Because UCB is not entitled to a range of equivalents that includes polyisobutylene, given the narrowness of its claims, the intentional decision to pursue acrylates and silicones, but not PIBs, as well as the election it made in response to the examiner's restriction requirement. In other words, no matter how you slice it, this is not an appropriate case for the doctrine of equivalence. It's not what it was meant for. Instead, as Festo holds, the doctrine of equivalence is premised on the limits of language. And here, there is no doubt that they had the words for a PIB-based system. And you know that for several reasons. In Graver Tank, the manganese and the magnesium were, I think, understood at the time of filing to be substitutes for each other. Why does that not decide this? Well, I think, Judge Toronto, a few things. First, subsequent to Graver Tank, you have the Supreme Court clarifying the doctrine of equivalence in Warner-Jenkinson and Festo. And in Warner-Jenkinson- But not specifically addressing any kind of circumstance in which the alleged equivalent was a mean equivalent before or in circumstances where there was a mere restriction requirement, et cetera. That is, circumstances like this. So certainly the Supreme Court didn't address exactly the details of a case like this. But I think it said a few things that are instructive. One, in Warner-Jenkinson, it said that the time that's relevant for known interchangeability is the time of infringement, number one. Number two, when you look at Festo, Festo is premised, and the decision there is premised on the notion that there are limits to language. And Festo says when you have a situation where there has been a narrowing, then you know a fortiori that they had the words. Now, the question would be- I'm getting a little confused. Are we talking about prosecution history estoppel right now, your prosecution history estoppel argument, or your what you call narrow claiming argument? Sure, Judge Chen. So first, the point that I'm making doesn't depend on the prosecution history estoppel point. I think that here you have a situation not only where PIB was foreseeable by the inventors, it was foreseen. And so this is a situation where, as Festo puts it, when the inventor turned their attention to the subject matter in question, they knew the words for both the broader and the narrower claim and affirmatively chose the latter. And I don't think that that reasoning is necessarily or should be limited to the context of where you have prosecution history estoppel. Now, here the case is even easier because prosecution history estoppel should apply based on the restriction requirement. And I think this Court's decision in Pacific Coast Marine, yes, that was a design patent rather than a utility patent, but there's nothing in the reasoning of this Court's decision that suggests that that should make any difference. And, in fact, if you look at the reason for the restriction requirement in Pacific Coast Marine, it was that you could only have one invention because you can only have one claim in a design patent. The same is true here. The restriction was because you could only have one invention. And you have the same policy concerns, which is this. The restriction requirement and the election that follows still rebuts the inference that the thing that was not described was indescribable, which, again, gets back to the premise of prosecution history estoppel infesto. Isn't there this difference? Excuse me. One thing that a restriction requirement does not do implicitly or otherwise is say that this identical claim on this identical specification is not patentable. Everything else, the indefiniteness and obviousness in Honeywell-Sunstrand, whatever the rejections that led to the changes in festo and everything else, involve the examiner saying you cannot have this broad claim on this specification, and now your attention is focused on how much you're going to narrow. Restriction just says we want two different patents. So two points in response to that, Judge Toronto. First, that was entirely true in Pacific Coast Marine as well. Nothing that would have prevented them from pursuing a different patent on the other claims. The point that I think that that case ultimately turns on, and I think that point is even stronger here where you're dealing with words as opposed to pictures, is the fact that they had claims to an adhesive and chose not to pursue those claims, at least for purposes of this patent, means they can have no argument that they didn't have the words. And that gets back to festo and the idea that the doctrine of equivalence is premised on the limits of language, or as Sage Products put it, put it I wonder if you're making too much of this idea of premised on the limits of language. Yeah, it is premised, but that doesn't mean that's not synonymous with saying every time language is available, we will forbid you to find equivalence when you don't use available language. Sure, and there are other scenarios as well. I mean, I think Sage Products puts it best where it found no equivalence there, saying that there was, quote, no subtlety of language or complexity of the technology or any subsequent change, i.e. in the technology, that would have prevented them from seeking the claim that covered what they... Wouldn't this position have the following consequence? Suppose you know that there are a number of different adhesives out there, but you don't know except for the two that you've tested that they work for this particular purpose. And now I have to delay my filing of my application on the two that I know work in order to test others that are used for other purposes as adhesives. Why would forbidding the availability of the doctrine of equivalence be a good rule that would force you to delay the application in that circumstance? Well, Judge Taranto, I think if you look at the claims that they actually pursued here, these are claims to an acrylate-based or silicone-based polymer adhesive system. And what they effectively are now asking for is just a polymer adhesive system. They didn't have to include the words... The fact that they're asking to cover the PIB, is it? Yes, PIB. Doesn't mean that they're asking for any old adhesive. We don't know that on this record. Well, Judge Taranto, I would submit, given the differences that were documented, indeed, by the district court at Appendix 128 between PIBs and silicones and acrylates and how they do their bonding, that on this, it effectively vitiates the claim term. Because at that point, given the differences that were disclosed or that were known, if you're going to say that equivalence applies here, it's hard to see where it would not apply. But I guess, if I could just follow up on what Judge Taranto was asking, it seems like I have that same concern, which is, what do you do as an inventor when you know a couple options work, and maybe there's a third option you're aware of that could also work for the same purpose, same goal, but that's going to require work, it's going to require experimentation, and are we going to require applicants to go forward with that additional work and experimentation to see whether or not that other potential option also works, and then claim it, as opposed to just allowing applicants to go ahead and start applying for claims directed to the things they know works under their experiments at the time? I appreciate the question, Judge Chin. And I think that here, if you look, for example, at Appendix 5916, you see that not only was it foreseeable that PIBs were known and were commonly interchangeable with these others, it was foreseen by the inventors. 5916 is their feasibility study. They specifically identify this as one of the three. So would it be fair to say you're not demanding that an applicant or an inventor go ahead and do that additional experimentation in order to write a claim broadly enough to cover polyisobutylene? The premise of your argument is they knew it already. That's exactly right, Judge Chin. That's my point, is that not only was it foreseeable, it was foreseen. And I'm not saying that they had to go off and do it. And the it here is they knew that it would work in for this particular process of delivering an effective dose of the underlying medication for treatment of Parkinson's. Well, what they knew and what the district court found at Appendix 127 is that PIBs were long known, along with silicones and acrylates, as pressure-sensitive adhesives that were well-suited for use in transdermal systems. And there's no suggestion by them that there would be a difference vis-a-vis reticotine versus anything else. And I think that when you have that situation, you have a situation much like Tanabe versus ITC, where the inventors chose to define their invention, in that case, in terms of a specific base-solvent combination rather than in terms of categories of solvents and bases. And a person skilled in the art would have known that the patentee could have used a broader term. Mr. O'Quinn, can I? I want to change the topic before you sit down and we'll restore your rebuttal time. And I want to ask you about the 414. What fact about the completion of the inventive activity was not already part of this litigation when the issue was tried under the derivation heading that would have been part of it had it been tried under the, essentially, let's call it the priority heading? Sure, Judge Tronso. I'm trying to get a sense of what concretely was missing or whether this is just you didn't say the right label. I understand. And with respect to the latter part, I don't think that's any small thing in terms of the waiver here. But let me address the first part of your question, and that's this. Evidence of derivation doesn't answer the question of whether or not there had been sufficient communication for joint invention. So you don't have just a single inventor here who allegedly did everything. You have different inventors having different roles. And you can see, for example, at Appendix 3952, one of the inventors, Wolf, testifies that it was Queer who did the analytical work. It was Reidner who did the chemical synthesis. And there's no suggestion that they were all doing it together. They were doing this independently. And the question then is, where does conception actually get communicated among the joint inventors? Because you can only be a joint inventor, as Eli Lilly says at 376. I'm sorry. I thought that there was a quite full record about what happened between the awful event of either early August or July or something of the precipitate and the eventual filing of November 30th, where everything was detailed about the communications between UCB and the LTS. I'm sorry. What was missing? So two different things. I guess there are two different sets of communications that your question is referencing, Judge Toronto. Yes, there were a number of elaborate communications between UCB and LTS. And, of course, that actually gave rise to our derivation argument. And we've briefed that, of course, and you can see that on the papers. But that wasn't about the communications among the inventors themselves. So Queer and Wolf are UCB. Where's Reidner? He is UCB as well, I believe. I see. Okay. And about the communications among them and the different roles that they had. And, yes, there was testimony about what they did in their respective roles in order to say that what they did was not derived from LTS, but not about the communications between them. So when you have that and then you have, of course, in the pretrial order itself, UCB is identifying the invention, the November 28th, 2007 is the date that it's relying on and saying that what it's going to show is that there was no use, not that there was earlier invention. And, similarly, the expert in his testimony at trial, Appendix 4336, is relying on November 28th, 2007. And that's what he's asked about in his rebuttal exam after our cross-examination. He specifically asked about whether or not there was use before November 28th, 2007. If they were going to argue that there should be, that the invention was before that, they needed to say something about that before their post-trial brief. And the district court was right and well within its discretion to find that was waived, just as it had found that we had waived a non-infringement argument as well. Sauce for the goose, sauce for the gander. If I can just pivot you back to the doctrine of equivalence. Yes, Judge Chen. I'd like you to speak to ring and pinion. Sure. Under the 834, the court said, excluding equivalence that were foreseeable at the time of patenting would directly conflict with these holdings that known interchangeability supports infringement under the doctrine of equivalence. Yes. So what are we supposed to do with that statement as to your narrow claiming argument? Right, so with respect to ring and pinion, I think you have to look at the context in which that case came to this court, which was on a stipulation from the parties below, in which they had literally stipulated, if foreseeable equivalence are barred by the doctrine of equivalence, then party X wins, and if they're not, party Y wins. And the court was answering the question, is there a per se bar to the doctrine of equivalence based on foreseeability? And this court answered that question, no. And I'm not relying just on foreseeability for purposes of our narrow claiming argument. I'm also principally relying on the idea of the limits of language. That is, Sage Products itself acknowledges that you might have something that would have been foreseeable, but subtlety of language or complexity of the technology would be a reason that you wouldn't expect it to have been specifically claimed. They can't argue this, that here, particularly given their own feasibility study at Appendix 59-16, this is a case of buyer's remorse. They knew about it. They chose not to claim it, and particularly when you add on top of that the fact that you do have the restriction requirement here in which they elected, and then ultimately voluntarily cancel their claims. And this court in Festo 9, on remand from the Supreme Court, said voluntary cancellation gives rise to a presumption of prosecution history estoppel. Okay, I think we should hear from the other side, and we'll restore your rebuttal time. Thank you, Judge Taranto. Mr. Blumenfeld. Thank you, Your Honor. I'm going to briefly start where Mr. O'Quinn started, and that is with Cygnus Claim 1, and then hopefully move on to the Doctrine of Equivalence issues. The Cygnus patent, which they are arguing anticipated Claim 1, was raised in the patent specification and specifically distinguished on the basis that it was not the free base and it was in water. It was the main reference that was distinguished throughout prosecution on the same basis. The only examples of reticotine in the Cygnus application are examples 15 and 16. Both of them are in water. They're in a phosphate buffer, which the record is not disputed. So did Judge Stark reject the anticipation idea or, yes, the anticipation idea that you could take the piece of Cygnus that says you can use ethanol instead of water and essentially combine it with the particular examples of rigotine in water? What Judge Stark said was that, correctly, that in another part of the Cygnus patent application, it refers to using other polar solvents than water. There's no example of it, and more importantly, he specifically found that there was nothing in the record that of what would happen if you put the reticotine into ethanol or into another polar solvent. He said there was just no evidence of what form the reticotine would take, and that's because activists didn't make any record of that. They put in no evidence of what would happen. So then are we supposed to take from Cygnus when it says you can use a lot of other different solvents, including ethanol, that Cygnus was just being speculative and it wasn't actually teaching the use of ethanol as a replacement for water? I mean, why would Cygnus say what it said unless it contemplated that there were a number of different solvents that could be used, including ethanol? And then here are some examples we've made, but nevertheless the scope of the disclosure encompasses using many different solvents, including ethanol. Well, what the Cygnus patent application says, if you read it, is that the drugs, and it's not only reticotine, but the other drugs that are in there, are placed in an aqueous phase with hydrated silicate, and that is that there is water there. Those are the only examples it gives. That's the only teaching it has. There is a statement or maybe two in the specification that say you could use a polar solvent such as ethanol. There's no example, but there's nothing. I take Your Honor's point, but there's nothing that tells you what you would get if you put reticotine into ethanol. There's no conditions. There's no information. And that's where Judge Stark went. He said, yes, they're pointing to ethanol, and I think as a basic matter, you don't take one part of a patent application and plug it into an example for another part. Sometimes you can. Well, sometimes you can, but here there was really no information which would lead you to do that, and what he said was if you did it, there's no record as to what you would get. Where did Judge Stark say that about ethanol? Somewhere in A154 to 158, if that was the section. Excuse me, Your Honor. It is at A158. Thank you. If I could turn to the doctrine of equivalence, unless there are more questions about Cygnus. There is no issue here that activists' system using PIB is substantially equivalent to the claim to mention. That was something that there was a lot of evidence on. Judge Stark found, and there is no appeal on that point, no claim anywhere that anything he found was clearly erroneous. There's also no disclaimer or disavowal, never has been an issue of a disclaimer or disavowal, never came up at claim construction or anywhere else. Can you explain what happened in the Wrigley opinion? The Wrigley opinion seems like the closest case for the other side to describe that when an inventor is aware of a possibly broader class of compounds that can be claimed, but for whatever reason chooses to recite a subset of that genus of compounds, then therefore the patent owner now is stuck with a scope limited to that subset of compounds recited in the claim and doesn't get to employ the doctrine of equivalence to capture the broader genus. Judge Hunt, I think there is more to Wrigley than that because when you read the Wrigley opinion and the lower court opinion, that case involved the chemical structure of a chemical compound. And during claim construction, the district court held that there was a disclaimer of non-I think it was carboxamides of that structure, that there was an express disclaimer based on the information both in the claim and in the specification, and it held that- But what do you mean there was an express disclaimer? Because neither the claim nor the spec ever referred to that larger genus but we really like and prefer this particular subset of compounds and that's why we're claiming the subset only and not the broader genus. As I understand the spec, it was completely silent as to that broader- I don't- I mean I have to say I haven't read the specification of the patent at issue there, but from reading the opinion and Judge Bryson's opinion on appeal, certainly they both said that the non-carboxamides that were claimed had been disclaimed and that had come up. Unlike here, that had come up during claim construction and the defendant, or the counter-defendant I guess it was there, specifically asked to have that excluded and it was excluded. And under those circumstances, the court said, you can't go in and claim that by equivalence. We have a very different situation here where there was no disclaimer and no argument that there was a disclaimer, no amendment, no disclosure, dedication. The defenders knew about PIB though, right? There's no question that- And they had reported out that PIB was known to be used as a possible polymer for design of these transdermal patches. There is no question, Your Honor, that there is evidence in the record that Dr. Mueller, who was the inventor that was involved here, knew that PIB could be used as an adhesive in transdermal patches. Getting back to a point that Judge Serrato made, when they applied for the patent, they had only done work on transdermal patches using silicone or acrylate adhesives. That's all they had done, that was their experience, and it was kind of refreshing that they applied for a patent application which was based on the work that they had done and didn't include work they hadn't done. What Dr. Mueller said was that he had used PIB- Would the Group 2 claims that got restricted out of the application encompass PIB? Would the- The Group 2 claims that got restricted out during the prosecution encompass PIB. That's an interesting question, Your Honor, because that was a different- It's either a yes or no answer, I think. Well, the reason I would say that it, based on the prosecution history, would not cover PIB, and this is in the judges'- the judges would not literally cover PIB, was because it included PVP, as the examiner said, and therefore would only include the silicone and not the acrylate. But whether there would have been equivalents, we'll never know. I mean, that's an interesting issue because there was never an amendment of the limitation that we're talking about here during any prosecution. The rejection- Actually, I would say the restriction- Can I get back to something I think we were discussing just a little bit earlier about Mr. Mueller and others? What evidence is there that even though he and others knew that PIB was a candidate for transdermal patch adhesive, that there was- Is there evidence that nevertheless there might have been some doubt about whether it would work for this particular transdermal patch? Your Honor, I don't know. I think the answer to that is that Dr. Mueller hadn't tested it, didn't know. His experience with PIB here was in a liquid form as a tachyphyre. That he did testify to. But the claim limitation that we're talking about here is not simply the polymer adhesive system. It also has to have a solubility of at least 5% for the free base of reticotine. That is part of the claim, and that was a key part of the claim in getting the application. I guess what I'm trying to understand, at least one better level of concreteness, is Mr. O'Quinn's description of a situation in which the inventor knows full well that A and B are substitutes. Both of them absolutely could work in this claim. Claims only A. It's troubling to say, even though with all of that knowledge and not even any doubt about whether B would work, you left B out. And now you're going to get it. Why is this case different from that case? Well, I mean, for a couple reasons. One, because there is no evidence of the this would work just the same. I mean, there's no evidence that Dr. Mueller knew that when they were applying for the patent. He applied for what he knew worked because they addressed that. What was Mr. O'Quinn referring to when he said he did foresee it? He gave a side I didn't write down. I'm sorry. Mr. O'Quinn said not only was this foreseeable, it was foreseen. And I think he referred to a specific document. And I think that is an overstatement. There certainly was a technology report at LTS where they listed. Before the application was filed. Before the application was filed, where they listed different types of polymer adhesives. And it was in the list. Was it ever tested with reticotine freebase, which is what's claimed here? No. Was there any information about the solubility of the freebase in PIB as there was with silicone and with acrylate? No, there wasn't. But to get back to your question, there are lots of limitations on the doctrine of equivalence. Amendment is one. And I think there was never an amendment here of this term. Disclaimer is one. They've been pretty careful to avoid the ones that are obviously not present. Right. And to point to the prosecution history rationale statement in Festo and the kind of sage products kind of notion of you chose this language, you're stuck with it. And they're making arguments that are available to them. Right. But as to the argument that there is some kind of limitation on the doctrine of equivalence as a result of what's in someone's head, there is no authority that I know for that. And, in fact, that is exactly opposite to this Court's decision in Ring Opinion. And as for the kind of that was old law, that was a 2014 opinion. And the issue in Ring Opinion was exactly the issue here. And I don't know how you could find a clearer statement from this Court. There is not, nor has there ever been, a foreseeability limitation on the application of the doctrine of equivalence. Getting back to the policy issue, here we have a situation where the inventor knew that silicone and acrylate polymer adhesives would work, had never tested PIB, and the solubility was unknown, at least from the point of view of having tested it. The notion that they had to claim something or lose it by equivalence, even though they hadn't made it, hadn't tested it, really, I think, puts the incentives in the wrong place. You want to encourage people to apply for patents on the work that they've done and not on things that might work in the future. Before your time runs out, can you turn to the 414 issue? Why was Chief Judge Stark wrong to say that this issue, this particular issue, was not flagged and maybe the record would have been different if it had been flagged? Well, Your Honor, I would start off by asking that the panel look at Appendix 2426, which is a page from the pretrial order, which specifically says that on September 23, 2007, that UCB, Dr. Caray, defined the structure Let me just get to the focus that is in my mind. There's material to work with, probably both sides, about whether you raised it enough or not. Put that aside. Why is Mr. O'Quinn wrong in saying it made a difference in what would have happened in the litigation, that you did not raise it more clearly than you did? Some issue would have been tried that wasn't issued. I think the one that he focused on was the relation among the three named inventors who were co-inventors, and I forget whether he was referring also to unnamed co-inventors, but something about communication. Your Honor, on the derivation point, I don't think there are any other facts that weren't tried, if that's what you're asking about. The communications between UCB and LTS. What about intra-UCB communications, which I think is what he was concentrating on. The intra-UCB communications were fine, too. There was never any issue involving inventorship or derivation as between different UCB inventors. Isn't that effectively his point? I don't think that is his point. I think his point, from their briefs, is that there were communications between the LTS people, like Dr. Mueller, and the UCB people, like Dr. Wolf. If there was an issue on any of this, of course, there could be a 256 inventorship correction, but we never got to that point. Just to try to create a concrete version of what I thought Mr. O'Quinn was arguing, in order for there to be a completion of the invention by the three co-inventors, we actually would have to know when Mr. Reidner, what he did and when. That was actually completely irrelevant to the derivation question, and so there would have been something more to try, had this issue been identified more clearly. I don't think there was anything more to be tried. We know exactly when Dr. Reidner made the Form 2. There is a report that's in the record dated November 14, 2007. Did he do the first one or the second one? There were two methods for making the Form 2. Yes, the second one. At that time, the memo spelled out that there had been a conception and there had been a reduction to practice. It involved the identification of the structure of the polymorph by Dr. Caray in September, and then the making of the Form 2 by Dr. Reidner in October. The three of them were not at the same location, but they were working together on this project. I don't think there's any question, and I didn't understand before just now, that Mr. Okun was raising an issue as between these inventors. Our issue, as you know from our brief, is a little different, and that is that we felt like we were sandbagged on the prior user defense, where they didn't even put on a case prior user defense in their case-in-chief, and it was only during cross-examination of our expert that they brought out a document that had never been put in their exhibit list in the pretrial order. That's why we think we haven't waived anything about the conception reduction to practice dates, because they didn't raise it until they were into our case. We had no reason to have earlier dates until they raised a date of alleged public use before the application date. Okay. Unless you have anything else, I won't. Thank you. Thank you. You have five minutes. Thank you, Judge Toronto. So let me respond on the last point that my friend said, and that's this, this idea that they were sandbagged. At trial, you can look at Appendix 4379. They didn't object to the admission of the exhibit that he's talking about. They didn't object to its use at trial at all. And as far as the point that Your Honor was having the colloquy with him a moment ago, that is exactly my point. The issue of when inventorship actually occurred was not litigated precisely because they didn't put us on notice that that was an issue that they were contesting. Now, there may have been other issues as well. Maybe my memory isn't very good. I don't remember in your brief here when responding to the challenge to Judge Stark's waiver issue, waiver ruling, that you identified this joint inventorship issue. Tell me if I'm just wrong. I remember coming away from the briefing thinking, I don't have a single concrete point in my mind about why this made any difference. Judge Toronto, of course, the way this guy briefed, we're responding to them as part of our consolidated reply. You get a yellow brief. I understand. And I don't recall off the top of my head whether we made this precise point or not. The point that we did make was that it would obviously have prejudiced us from the ability to contest issues at trial, including when this purported conception and reduction of practice actually happened among the joint inventors, and that we had been led down the primrose path because of every single step, whether it was in the pretrial order or at trial with their experts' affirmative testimony or the questions that their expert was asked on rebuttal when we had raised the issue of use. And they were on notice. Didn't Chief Judge Stark find in the course of rejecting the derivation argument that there was conception and reduction to practice by October 30th? I don't recall, Judge Toronto, that he made a specific finding that there was conception and reduction to practice by that date. I do recall that he found that what they did was separate from- That they identified using the right form of crystallography and then reproduced it by October 30th. I mean, what else is there? Right. But that goes, again, to there being different individuals having different roles at different points in time. And if they're going to then say, okay, well, that gives rise to an earlier priority date, this business that they were not on notice of that we were arguing of use prior to November 28th is simply not true. You can look in the joint pretrial statement. We specifically identified that, you know, as of November 12th, they were telling the FDA that these things were being used in the United States from lot 47808, which necessarily contained these crystals. Let me, if I may, turn to our affirmative appeal. And I think the Wrigley case here is indistinguishable. And I think what's telling about Wrigley and its reasoning, number one, is obviously there's no limit on language there that would have prevented the claiming. And number two, it specifically distinguished other cases, like Abraxas, where it was unknown at the time of patenting that an alleged equivalent was a suitable substitute. And so when my colleague says, well, there's no case that looks at, you know, what would have potentially been in the inventor's head, well, maybe not in their head specifically, but what would have been known to a person of ordinary skill of the art at the time of patenting, Wrigley is directly on point. And I think Judge Bryson's decision, joined by Judge Newman, is indistinguishable in this regard. And very much like what was at issue in Tanabe v. ITC as well. And Judge Chin, you asked sort of a policy question here. Like, shouldn't we be concerned about inventors in new fields having to run out and test lots of different things before they submit their patent application? And don't we want to encourage them to go ahead and submit it? I think it's worth taking a step back and just recalling the context in which they pursued this patent. This is a patent where they tried to claim narrowly to get around the Cygnus prior art. I don't think they did that, and I'll come back to that as my final point. But to try to get around the Cygnus prior art. They had worked with Cygnus, and now what they were essentially doing was replacing water with a different solvent. And they knew full well that these were the three most common adhesives. This is not just some long laundry list. The site that I referenced, Judge Toronto, that you were asking about a moment ago, is 5916. It is the feasibility study by inventor Mueller. And the strategies, it says, for the formulation of matrix systems with a self-adhesive matrix formulation, the following adhesives are most commonly used. Silicone-based adhesive, polyacryl resin-based adhesives, polyisobutylene-based adhesives. They chose to claim the first two and not the third, and they gave up claims that would have reached the third in their election under the restriction requirement. All right, thank you, Judge Toronto. Thank you.